OPINION OF THE COURT
Saxe, J.
The question raised by this appeal is whether the trial court properly granted defendants’ in limine motions and precluded plaintiffs neurological experts from testifying, on the grounds that the first expert’s theory of causation was negated by a supplemental report and that the second expert’s theories of causation either failed to pass the Frye test or were untimely *196 raised. We hold that the proposed testimony by plaintiff’s experts should not have been precluded. The essence of these witnesses’ position on causation—the unremarkable premise that the physical trauma caused by the motor vehicle collision was a competent producing cause of plaintiffs embolic stroke— did not require a formal Frye hearing. Moreover, even if a Frye hearing was appropriate, the evidence before the court was sufficient under Frye to avoid preclusion of the testimony.
This action arose out of a motor vehicle accident that occurred on October 2, 2006 between a limousine driven by plaintiff Kamal Sadek and a Greyhound bus operated by defendant Aaron Jenkins (sued herein as Jenkins A. Wesley). Plaintiff asserts that during the accident his head slammed against his side window. After both drivers exited their vehicles and began an angry verbal exchange, plaintiff became faint and dizzy, started to shake, and found that he needed to sit down. He then became unresponsive, and was transported to St. Luke’s Roosevelt Hospital, where he was diagnosed with an embolic stroke, also called a cerebral vascular accident (CVA). A report from St. Luke’s Roosevelt Hospital dated October 4, 2006 described the results of two tests performed on plaintiff: a transesophageal echocardiogram disclosed a mobile thrombus (a large blood clot) anchored to the left subclavian artery, and a magnetic resonance angiogram reportedly disclosed atheroma (plaque) in the aortic arch. Plaintiff was placed on aspirin and Plavix.
Plaintiff brought this action against the bus company and the bus driver, alleging that the accident was caused by the negligence of the driver, and that it precipitated the embolic stroke, or “aggravated, activated and/or precipitated any underlying . . . circulatory, arterial, venous or systemic condition, which was asymptomatic prior to the accident.”
Plaintiff designated Dr. Nabil Yazgi as his neurological expert. His CPLR 3101 (d) notice stated that Dr. Yazgi, a neurologist who served as director of the Stroke Center at New York Presbyterian Hospital, would testify at trial in conformity with his report dated September 23, 2010. In that report, Dr. Yazgi stated that there was a “probable causal relationship” between the motor vehicle accident and the CVA.
However, in a supplemental report dated June 28, 2011, Dr. Yazgi pointed out that a medical report dated November 28, 2006, some eight weeks after the original October 4, 2006 report, stated that the thrombus and atheroma observed in the October *197 4, 2006 report were no longer evident. Dr. Yazgi stated that “[t]his is physiologically unlikely[,] which suggests the first report was possibly artifact,”* although he then remarked that “[assuming this clot was present on the first report, trauma could feasibly have dislodged it, or a portion of it, causing an embolic stroke.”
When the matter came on for trial, after the jury was empaneled on October 13, 2011, defense counsel served seven motions in limine seeking to preclude each one of plaintiffs expert witnesses: his expert on liability, his primary care physician, life care expert, lost earnings expert, speech therapist, vocational rehabilitation expert, and neurologist. After hearing argument, the trial court reserved its ruling as to the other six challenged experts, but granted the motion as to Dr. Yazgi.
The trial court reasoned that Dr. Yazgi’s first report was negated by his supplemental report dated June 28, 2011 stating that there was no thrombus present on November 28, 2006, and that the supplemental report failed to sufficiently establish causation, since in it, Dr. Yazgi stated merely that trauma “could have” caused the embolic stroke. The court then granted plaintiff a four-day continuance, so that he could locate another neurologist, with the proviso that the new expert could not rely on a new theory. Plaintiff retained a second neurological expert, Dr. Sang Jin Oh, on October 20, 2011, and provided defendants with a new 3101 (d) notice stating that Dr. Oh was prepared to testify that the cause of plaintiffs embolic stroke on October 2, 2006 was the motor vehicle accident that day, and further stating that he adopted the opinion stated in Dr. Yazgi’s September 23, 2010 report.
The next day, defendants challenged the use of Dr. Oh’s proposed testimony, relying partly on the same ground as their challenge to Dr. Yazgi and partly on the ground that, according to their own neurological expert, Dr. Alan Segal, an embolic stroke cannot be caused by trauma and plaintiffs expert was relying on a novel theory of causation. The court granted defendants’ application for a Frye hearing (see Frye v United States, 293 F 1013 [DC Cir 1923]).
In an affidavit by Dr. Oh dated November 2, 2011, supplied to counter Dr. Segal’s assertion that plaintiffs theory of causation *198 was novel, Dr. Oh cited two studies. He reported that the results of an Israeli study, assessing potential stroke-triggering effects, including emotional stress and sudden changes in body position, indicated that in more than 20% of stroke patients studied, abrupt changes in body positions had occurred within two hours of stroke onset. The authors of the study concluded that sudden changes in body position are among the possible triggers of an embolic stroke. Dr. Oh listed nine professional journal articles that cited or discussed the study.
Dr. Oh also cited a Finnish study based on about 2,303 male volunteers over a period of 11 years that found that men who were under stress and who experienced an increase in systolic blood pressure also experienced an incremental increase (1.5% for every one point increase in systolic pressure) in their risk of having a stroke over that 11 year period. Dr. Oh indicated that a sudden spike in systolic pressure would cause damage to the outer layer of the blood vessel, causing the formation of plaque, and that if plaque buildup is already present, a spike in systolic pressure can cause plaque to rupture and emboli to break off.
At the Frye hearing Dr. Oh testified to the same effect, concluding within a reasonable degree of medical certainty that the accident was a competent producing cause of plaintiff’s embolic stroke.
The defense emphasized that Dr. Yazgi had never referred to stress or a spike in blood pressure as factors contributing to plaintiffs stroke, and argued that Dr. Oh was offering at least four new theories of causation, namely, that plaintiffs stroke was caused by (1) a spike in blood pressure; (2) the trauma of the motor vehicle accident; (3) the “drama” resulting from the verbal altercation between plaintiff and the bus driver; and (4) plaintiff’s banging his head during the accident. Defendants argued that none of these theories was identified in Dr. Yazgi’s report, which had now been adopted by Dr. Oh.
At the conclusion of the Frye hearing, the court precluded Dr. Oh from testifying. First, the court reasoned that Dr. Oh’s theory regarding two mechanisms that caused the embolus to detach, namely, an abrupt change in body movement and a spike in blood pressure, constituted new theories of causation. Second, the court held that Dr. Oh failed to show that these theories had gained general acceptance in the medical community. The court also noted that Dr. Oh suggested that the spike in blood pressure caused shearing within the vessel, which detached a piece of the thrombus, causing the embolism, but remarked that shearing was not mentioned in the relied-on studies.
*199 The preclusion of Dr. Oh’s testimony forced plaintiff to concede that he would be unable to establish a causal connection between the accident and his stroke, and since he had already withdrawn his claims for orthopedic injuries, he was left without proof of serious physical injury caused by the accident. Consequently, the court dismissed the complaint.
Discussion
At the heart of this appeal is a dispute as to whether the accident could have caused the embolic stroke plaintiff experienced. Although the trial court has broad discretion to rule on the admissibility of evidence, we agree with plaintiff that the trial court should not have granted the part of defendants’ motion in limine seeking to preclude plaintiffs neurological experts from testifying, thereby preventing plaintiff from making his case.
Initially, we find that the preclusion of Dr. Yazgi’s testimony was erroneous. Dr. Yazgi’s assertion, in his first report, dated September 23, 2010, that there was a “probable causal relationship” between the motor vehicle accident and plaintiffs embolic stroke, citing the October 4, 2006 report from St. Luke’s Roosevelt Hospital describing a mobile thrombus anchored to the left subclavian artery and plaque in the aortic arch, provided a sufficient basis for permitting him to testify as to the cause of plaintiff s embolic stroke. While Dr. Yazgi’s supplemental report certainly provided grounds with which to impeach his anticipated trial testimony about where the embolus that caused the stroke had been formed, it did not absolutely invalidate Dr. Yazgi’s proposed testimony regarding the cause of plaintiffs stroke; it merely created some doubt as to the initial source of the em-bolus.
Nor could defendants’ motion properly be granted based on their other argument, namely, that Dr. Yazgi’s CPLR 3101 (d) statement failed to sufficiently set forth the mechanism by which the stroke occurred. Dr. Yazgi’s 3101 (d) statement with narrative report was served more than a year before trial. Defendants had the option of moving for an amplification or to require the witness to provide a more complete explication of his theory of causation (see e.g. Mead v Dr. Rajadhyax’ Dental Group, 34 AD3d 1139 [3d Dept 2006]). Their motion in limine on the eve of trial to entirely preclude the witness on that basis was unnecessary and improper.
Moreover, the so-called mechanism of plaintiff’s embolic stroke, by definition, involved some sort of clotted blood dislodg *200 ing and making its way to the brain. Any uncertainty as to the exact location of the embolus before it dislodged did not invalidate the claim that it was the accident that caused it to dislodge. Defendants were free to challenge the expert’s assertion that the embolus dislodged as a result of the collision, but plaintiffs right to proceed on that claim was not dependent on the expert’s ability to map the exact path the embolus traveled.
The testimony of plaintiff’s second neurological expert, Dr. Oh, also should not have been precluded. While it is appropriate for a trial court to preclude testimony setting forth an entirely new theory of causation (see 1861 Capital Master Fund, LP v Wachovia Capital Mkts., LLC, 95 AD3d 620 [1st Dept 2012]), Dr. Oh’s proposed testimony did not entirely concern a new theory. Plaintiffs theory of causation, as disclosed to defendants, had always been that the accident caused an embolus to dislodge and travel to the brain. Even accepting, for argument’s sake, that Dr. Oh raised an entirely new theory by claiming that the accident caused a spike in plaintiffs blood pressure, which in turn caused the embolus to shear off, Dr. Oh was also prepared to testify that the physical trauma to plaintiffs body during the accident was a probable cause of the embolus’s breaking away; to that extent his theory of causation was certainly not new.
We reject the trial court’s determination that a Frye hearing was necessary. In the first place, defendants’ moving papers failed to justify the need for a Frye hearing at all. The affidavit by defendants’ expert in support of the motion merely asserted that the expert had “conducted a search of the relevant medical literature” and had found no support for plaintiffs theory that the trauma from a motor vehicle collision caused the embolic stroke. Notably, defendants’ expert did not even point to literature or studies disproving such a link. Therefore, when, in response, plaintiffs expert provided proof that literature supporting the theory existed and had been published in reputable professional journals and cited or discussed in others, the basis for defendants’ claim was negated; no factual issue was presented. At that point, it was up to the jury to decide whether to accept the assertion that the physical impact experienced by plaintiff in this accident was a competent producing cause of the embolic stroke.
Contrary to the dissent’s assertion, the opinion of plaintiffs expert that the impact of the collision was a competent producing cause of the dislodgement of a clot, resulting in his stroke, is *201 not the type of novel theory of causation that necessitates a Frye hearing; it was merely an opinion explaining the physiological process that caused the stroke plaintiff suffered.
Even assuming that the assertion by defendants’ expert warranted an evidentiary hearing to assess the reliability of plaintiffs expert’s causation claims, the evidence presented at the Frye hearing sufficiently established the reliability of those claims.
Frye hearings are used “to determine whether the experts’ deductions are based on principles that are sufficiently established to have gained general acceptance as reliable” (Marsh v Smyth, 12 AD3d 307, 308 [1st Dept 2004]). The test is particularly useful for newly minted or experimental processes or newly posited psychological theories, in order to weed out baseless and unreliable theories; a Frye hearing “should be held only if the basis for the expert’s conclusions is novel” (id. [Saxe, J., concurring]). “[W]here the proposed expert testimony concerns a claim that the plaintiffs injury was caused by the actions taken by the defendants, the whole concept of the Frye analysis is of limited applicability” (id. at 311).
As the Second Department observed in Zito v Zabarsky (28 AD3d 42, 44 [2d Dept 2006]), “general acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion. Rather it means that those espousing the theory or opinion have followed generally accepted scientific principles and methodology in evaluating clinical data to reach their conclusions.” There is no need here for the consensus the dissent claims is necessary.
As was the case in Marsh v Smyth, the dispute here concerns the mechanism of the injury, that is, the physiological process by which the damage came to occur. In contrast to the scientific community’s approach to newly developed DNA tests or polygraph tests, new processes such as posthypnotic recollection, or newly posited theories such as multiple chemical sensitivity syndrome, where the question is whether one physical event led to another physical event, it cannot be expected that numerous studies would quickly be conducted on the point (id. at 310-311). Therefore, the court’s Frye-type inquiry, if any, needed only to address the “question of whether the proffered expert opinion properly relates existing data, studies or literature to the plaintiffs situation, or whether, instead, it is connected to existing data only by the ipse dixit of the expert” (id. at 312 [internal quotation marks omitted]). Plaintiffs expert showed *202 that the conclusion he reached, that the vehicular collision caused the dislodgement of a blood clot, leading to plaintiffs embolic stroke, was supported by a “reasonable quantum of legitimate support” (id.), specifically, the Israeli study assessing stroke-triggering effects of sudden changes in body position, and the professional journal articles that cite or discuss the study, thereby satisfying the requirements of Frye.
The dissent not only asserts that plaintiffs theory of causation is novel, and insufficiently accepted in the medical community, but, oddly, it also suggests that plaintiffs stroke could have happened before the accident, and actually caused the accident, although it fails to point to anything justifying such a suggestion. The facts themselves do not support that conclusion. Plaintiff exited from his vehicle and engaged in a verbal altercation with the driver of the bus before his stroke symptoms began to emerge. It is evident that the stroke happened within minutes after the accident.
In fact, the dissent’s strange suggestion that plaintiffs stroke could have happened before the accident and caused the accident seems to be included more as a rhetorical device than as a real possibility. It seems to be offered as a springboard from which the dissenter can assert that he would not “presume to decide the question of whether there is a cause and effect relationship between the accident and the stroke as a matter of law.” But, that is not the determination we are making. We merely hold that the causation question is one that may be decided by the jury.
The dissent also suggests that the stroke’s occurrence so soon after the collision was simply coincidental, unrelated to the impact of the collision. That dubious notion does not properly counter the more likely scenario, based on the facts in the record, that the collision of the massive bus into the much smaller vehicle, with the attendant head trauma to plaintiff, physically caused the dislodging of an embolus. In any event, the defense is free to proffer that alternative scenario to the jury as well.
We must also reject the dissent’s suggestion that the impact of the collision was too “minor,” at too slow a rate of speed, to have caused any such injury. It should be recalled that the vehicle with which plaintiff’s vehicle collided was a 37,000-pound bus. The impact of a collision with a vehicle of that weight, even at a slow rate of speed, would be substantial. While the dissent’s argument in this regard would be appropriate to make to a jury, it is not a proper basis for rejecting plaintiffs causation claim as a matter of law.
*203 Finally, we find it troubling that defendants waited until the day the jury was empaneled to serve seven in limine motions to preclude all seven of plaintiffs expert witnesses, although the date on their motion papers indicates that they were ready to be served more than two weeks earlier. While the CPLR does not contain any time limitations applicable to in limine motions, and there are no rules about their content, there are circumstances when their use is improper (see e.g. Downtown Art Co. v Zimmerman, 232 AD2d 270 [1st Dept 1996]). Here, although defendants’ motions were intended to be, and turned out to be, dispositive, the means by which they were presented to the court reflects an intentional avoidance of the strictures of the CPLR’s notice provisions for motions. In effect, defendants’ strategic decision created something akin to an ambush.
The dissent’s implication that the ambush was plaintiffs own fault, for advancing a novel theory on the eve of trial, distorts the facts. It was defendants’ belated, eve-of-trial motion that caused plaintiff to buttress his theory, which defendants then challenged as a new theory first offered on the eve of trial. Trial courts should take care that the informal procedure of in limine evidentiary applications is not abused so as to unfairly tip the scales.
Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about November 3, 2011, which precluded the testimony of plaintiffs neurological expert and directed that judgment be entered dismissing the complaint, and which brings up for review an earlier ruling precluding the testimony of plaintiffs first-proposed neurological expert, should be reversed, on the law and the facts and in the exercise of discretion, without costs, and the matter restored to the trial calendar.

 An artifact is a blemish or image in the radiograph that is not present in the roentgen image of the object (http://medical-dictionary.thefreedictionary.com/ artifact).